(No. 7205. December 23, 1944.)

STATE OF IDAHO, Respondent, v. WINSTON CHURCHILL HENRY, Appellant.

[154 Pac. (2d) 184.]

Frank Griffin for appellant.

AILSHIE, J.—March 21, 1944, Winston Churchill Henry, Albert Malloy Hilbert, and James Turner Owens were charged with the crime of grand larceny, committed August 21, 1943, at about four o'clock a.m., by stealing and carrying away "from what is known as the Idaho State Liquor Dispensary, situate on Sherman Avenue, in the City of Coeur d'Alene, Kootenai County, Idaho, 131 cases and two one-fifth gallon bottles of assorted brands of whisky, having a value exceeding $60.00, and of the value of $5,586.20, said whiskies then and there being the properties of the State of Idaho."

The defendants were tried to the court with a jury. A verdict was brought in, finding defendants each guilty as charged. Judgment on verdict was entered remanding defendants to the custody of the sheriff. From detention in the county jail, defendants were to be confined in the state penitentiary at hard labor for a period of not less than three years. Defendant Henry filed motion for a new trial and motion to vacate judgment, which motion was denied. From the order denying the motion and from the judgment, Henry appeals. Defendant Hilbert separately appealed from the judgment of conviction. No appeal was taken by defendant Owens.

In Henry's testimony, he denied stealing any whisky or having any connection with anybody who stole whisky from the state. Henry did quite a bit of business with West in Seattle. "West was one of the partnership—or owner of the Two Pal (road or gambling house) on Jackson Street",

Seattle. Henry ran a crap game there; West gave Henry a concession on the gambling, for "Half of the take". West and Henry borrowed money from each other at various times. Often West left money with Henry to give to "maybe thirty or forty different people."

West, principal witness for the state, was in the grocery business in Seattle. He testified for the state, in part, as hereinafter quoted. He said he bought 128 cases of Bourbon whisky from Owens and Hilbert; and it is undisputed that this liquor was all marked with the Idaho Liquor Dispensary brand.

 Our search of the record fails to disclose any substantial evidence connecting appellant with the theft or transportation of the property in question or any knowledge of the theft until this charge was lodged against him. That appellant is a gambler and was as such associated with the witness, West, brands him as a law breaker, but not with the offense of grand larceny. This latter fact alone is sufficient to arouse suspicion in the minds of the jurors against appellant but, after all, suspicion is not sufficient to support a conviction. (*State v. Wilson*, 62 Ida. 282, 284, 111 P. (2d) 868.) Nor can the vileness or iniquity of his associations be accepted as reason or excuse for conviction of the felony charged. In all the evidence, admitting all that the state offered, the most that can be suspected, regarding the appellant Henry, was that, having been designated as the man to whom West was to pay some of the money, it might be inferred that he was going to enjoy with Hilbert and Owens the fruits of the larceny; but to go on and from this presumption to stray further afield and presume he must have had something to do with the crime and, from this presumption, leap a bit further and decide that, since he must have had something to do with it, he must have either helped plot, helped abet, helped solicit, helped assist, in the perpetration of the crime, or take a further stride and deduct that he must have been one of the larceners and rest a conviction thereon, is indulging in too many presumptions. (*State v. Grimmett*, 33 Ida. 203, 208, 209, 193 P. 380; *People v. Flores*, (Cal. App.), 137 P. (2d) 767, 770.) The fact that appellant is a professional gambler was neither competent evidence against him in this case nor does it constitute evidence of the larceny charge against him.

It is undisputed that Owens and Hilbert (co-defendants) requested the purchaser (West,), after receiving the goods in Seattle, to pay a part of the purchase price to appellant. It no where appears, however, that this information was imparted to appellant or that he knew or understood that he was receiving payment for or on account of the sale of stolen liquor. On the contrary, so far as any evidence was produced, he understood that the payment was made on account of previous indebtedness by West to him arising out of their varied partnership transactions in the gambling business. It is undisputed that they had considerable financial dealings, one with the other; and West's indebtedness to appellant sometimes reached into the thousands of dollars. While the conduct and business associations of appellant are sufficient to arouse suspicions, if not actual prejudice against him, it does not supply the place of evidence of guilt of the offense charged.

As showing the nature and character of the evidence upon which the state relies for affirmance of the judgment, we quote the strongest and most outstanding evidence contained in the record against him as follows:

"Q. Now, Mr. West, did you have any transaction with these defendants at that time? A. I did.

"Q. What was the transaction? A. I bought some whisky from them.

"Q. You bought some whisky from them. Do you remember how many cases you bought from them? A. Yes, sir.

"Q. How many? A. 128.

"Q. 128 cases? A. Yes, sir.

"Q. Was that Bourbon whisky or Scotch whisky? A. No Scotch.

"Q. No Scotch. All Bourbon? A. Yes, sir.

"Q. Do you remember any of the brands of whisky? I mean by brands, the name of the whisky. A. I don't think I could remember it all. I can remember some of it.

"Q. What do you remember as some of it? A. Some were Granddad, Burton's Century Club, and Bourbon Supreme, one case of Seagram Seven Crown.

"Q. And altogether, it was 128 cases? A. Yes, sir.

"Q. I will ask you to look at what have been marked for identification as Exhibits 2 to 24. Those are these cases here. And ask if those resemble the cases that you purchased from them.

"A. That looks like it to me.

"Q. That looks like it to you. Do you know from what state the whisky was that you purchased from those three men?

"A. It all had Idaho brands on it.

"Q. It all had Idaho marks on it.

MR. CHAVELLE: He didn't say that, did he? He said brands—not marks.

MR. HAWKINS: Is that what he said? I didn't—

MR. CHAVELLE: You better not repeat then.

MR. HAWKINS: (Q) What did it have on it?

"A. Well, the word 'Idaho' was on it.

"Q. How did you pay them for the whisky, Mr. West— by the case? A. That is right.

"Q. And was that a straight price—straight through? A. Yes, sir.

"Q. Mr. West, to whom did you—Did you pay the money all at once? A. No, sir.

"Q. How much did you pay that night? A. $2000.

"Q. And to whom did you pay that? A. To Lucky and Hilbert.

"Q. To Lucky—and by Lucky you mean Owens? A. Yes, sir.

Q. And to Hilbert. Was the whisky in the truck? A. Yes, sir.

"Q. Who unloaded the whisky from the truck?

"A. We (Owens, Hilbert and West) unloaded it and stacked it in my place.

"Q. Stacked it in your place? A. Yes, sir.

"Q. Do you have facilities there to store merchandise—like this, I mean? A. I did have. I did have, yes, sir.

"Q. And about what time was it when you finished unloading the whisky? A. Oh, it was about six o'clock—something around that time.

"A. And then what happened to the truck? A. Owens taken it away.

"Q. He drove it away? A. Yes, sir.

"Q. Now, when did you pay—next pay any money for the purchase of the whisky? A. Sunday.

"Q. That would be the following day? A. Yes, sir.

"Q. And how much did you pay then? A. I don't remember just what it was. I think it was $1500 or $2000. I don't remember exactly.

"Q. And to whom did you pay that? A. I don't know how the transaction with them was, but they made some arrangement for me to pay it to Shorty.

"Q. Did you pay it to Shorty? A. Yes, sir.

"Q. And who is Shorty? A. That is Henry—Mr. Henry.

"Q. That is Winston Churchill Henry? A. Yes.

"Q. Now, later on than the 22d, the Sunday, did you later pay any money to any of them for this whisky. A. Yes, sir.

"Q. About how much later was it? A. Well, it was two or three days later. It was Monday. And at this time I paid them some more money. Monday—Monday when the bank opened, I paid them some more money.

* * * *

"Q. To whom did you sell some of it? (the whisky)

"A. Sid Brunn.

"Q. Sid Brunn. Do you remember how much you sold

him out of this whisky altogether—approximately or exactly, either one?

"A. Saturday night I taken him twenty or twenty-eight cases. I don't know just what it was.

"Q. Twenty or twenty-eight on Saturday night? A. Yes, sir.

"Q. Did you deliver any to him on Sunday?

"A. Twenty cases more on Sunday.

"Q. Twenty cases more on Sunday. Did you later deliver any more of those to him? A. No, sir—I don't remember just how much, but I sold him the last of it. I don't remember the exact number of cases.

"Q. And was it the same—it was this same whisky that you purchased from these three men? A. Yes, sir.

"Q. That is, the Idaho whisky? A. Yes, sir.

"Q. How much did Mr. Brunn pay you for it? A. $70 and $75.

\* \* \* \*

"A. I paid him (Mr. Henry) the money for the whisky. What he did with it, I don't know. I know they were satisfied. I know they got the money.

"Q. You didn't pay him the money for the whisky. You paid them (Hilbert and Owens) the money for the whisky. It was only the portion that you owed Mr. Henry?

"A. I paid him the money for that.

"Q. How much? A. The balance of it—whatever it was. I don't know.

"Q. How much was it? A. You can figure out what 120 cases would be at $60 a case.

"Q. I want to know what you paid him. You paid him a large sum of money. A. I can't—I can't tell you exact right off how much it was, but at $60 a case—

"Q. About how much? I don't care just exactly.

"A. Well, it would be—just a second, I can tell you. I gave him about—over $8000.

"Q. $8000? A. Yes, sir.

"Q. For this whisky? For this whisky here? A. Well, for the—

"Q. I asked for this whisky only. $8000, was it?

"A. Something of that line.

"Q. For this whisky, in this courtroom, you figure 129 cases?

"A. For the whisky that I bought from them. I don't know that—

"Q. I didn't ask you that. I asked about this whisky.

"A. I paid them $60 a case, whatever it was.

"Q. I asked you how much you paid Mr. Henry. How much was it, if you know? About how much? Approximately how much? Nearly how much? As near as you can remember, how much?

THE COURT: I think he has answered that.

"A. I don't know exactly. I would want to—I don't remember just how much I paid them the next day; and then I paid him (Mr. Henry) the rest of it—I don't know what it was.

MR. CHAVELLE: (Q) You paid them some money, and then the next day you paid him the rest of it? A. No, sir.

"Q. Isn't that right? Isn't that what you said?

"A. No, sir, I didn't say that.

"Q. What did you say? A. I paid him $3000 on Saturday evening.

"Q. Yes. A. And $3000 on Sunday and Monday. I don't know exactly.

"Q. You paid them? A. No, sir. I paid them. Then the rest of the money I paid to Mr. Henry to give to them.

"Q. You just handed it to him and asked him to turn it over to them? A. Yes, sir.

"Q. You didn't tell him what it was for? A. He knew what it was for. *I told him I owed them some money.*

"Q. You told him you owed them some money?

"A. For the whisky, yes.

MR. CHAVELLE: That is all.

### RE-DIRECT EXAMINATION

"BY MR. HAWKINS:

"Q. *Mr. Hilbert and Mr. Owens had told you to give it to Henry?* A. *Yes, sir.*" (Italics supplied).

It should be remembered that appellant was at no time present at West's place with defendants, Owen and Hilbert; and that none of the conversations related or were had in his presence, so far as the record discloses.

We have examined the instructions complained of by appellant and find no prejudicial error therein. When all taken and considered together, they are most favorable to defendant. There was no error in rejecting the requested instructions, some of which correctly stated the law and others were erroneous.

The judgment against appellant, Winston Churchill Henry, is reversed and the cause is remanded to the trial court, with instructions to grant a new trial if the prosecuting attorney represents to the court that he believes he can produce additional testimony against appellant; otherwise, to dismiss the case. It is so ordered.

Holden, C.J., Givens and Dunlap, JJ., concur.

Budge, J., dissents.