(No. 7185.   May 5, 1945.)

STATE OF IDAHO, Respondent, v. RICHARD HAYNES, Appellant.

[158 P. (2d) 742.]

Earl E. Garrity for appellant.

Frank Langley, Attorney General, and J. R. Smead, Assistant Attorney General, for respondent.

AILSHIE, C.J.—This is an appeal from a judgment of conviction for the crime of burglary in the second degree and persistent violator of law; the charge being, that defendant (appellant herein) "did then and there. . . enter in the daytime that certain dwelling house. . . in Caldwell . . . the same being the residence of L. A. McBride, with the intent then and there to commit larceny therein". The property supposedly stolen was a "bill fold, with enclosures". Appellant was sentenced to imprisonment in the state penitentiary for a term of not less than five years nor more than twelve years. On a former trial in this case, on the same charge, he was sentenced to imprisonment for a term of seven years; on appeal the judgment was reversed and the cause remanded for a new trial. (*State v. Haynes,* 64 Ida. 627, 135 P. (2d) 300.) On the first appeal, the trial was held before Judge Buckner, Judge of the Seventh Judicial District; however, on the trial in the second appeal, he deemed himself disqualified and it was ordered that Judge Koelsch, of the Third Judicial District, preside. Motion for new trial was denied by the court. From the judgment of conviction and the order denying motion for new trial, defendant appeals.

The testimony introduced on the two trials and the witnesses called are practically the same. However, on the second trial, four additional witnesses (including defendant ) were introduced and testified.

Appellant's (defendant's) testimony, briefly stated, is as follows: That his true name was Enzley C. Loveland; while on the coast, he took out a boxing license under the name of Richard Haynes and boxed under that name for several years; that he held criminal records from three penitentiaries, two in California, for two charges growing out of the same transaction, burglary and forgery; about June 28, 1939, in Boise, he was arrested for attempted burglarization of a hospital there. He served a sentence in the Idaho State Penitentiary from July 1, '39, to February 6, '41, and was given one year conditional pardon, at which time he went back to Missouri and worked in electrical construction work, then worked in Wyoming, back to Nampa and, in August, '41, to McCall, during

which month he returned to the penitentiary and finished the "parole inside instead of outside." He drank heavily. As to the present charge against him, appellant denied being in the McBride house and testified that he bought the pocketbook some time in the last part of July or the first of August, 1941, of a man named Johnson, in Randy's Club, Nampa.

Appellant's sister, Mrs. Lovilla Wood, testified that appellant helped her, March 28, 1942, (the day of the alleged burglary), "clean up around the garden and throughout the house. . . He worked for me all day." She recalled this particular day as it was the same date she paid off the contractor who did some remodelling work in her house and she had a cancelled check to show the same. Plaintiff's objection to the check was sustained, but later the court stated: "I believe I will let this check go in, Mr. Garrity. The check itself, of course, is worthless." The check was thereupon admitted and marked as Defendant's Exhibit No. 1.

Testimony of the other two witnesses, introduced on the second trial, is as follows: Mr. George Zeal, employed by the Nampa Police department, testified as to the finger print record in the case. Mr. W. R. Thompson, a guard at the penitentiary, testified as to the commitment papers sent up with appellant.

Mr. A. E. Sutton, (who also testified at the first trial) operated a drug store in Caldwell and had handled leather goods for "some forty years"; the leather goods were usually marked by him personally. As to the purchase of the billfold, that the state contends appellant purloined or stole from the McBride residence, Mr. Sutton's testimony discloses:

"A. I sold Mrs. McBride a billfold bearing the Masonic emblem of that type. Whether that would be the one would be hard to say.

"Q. You don't know. You did know that it was double stamped when you sold it, didn't you? A. *No, sir. If I had, I would have returned it to the manufacturers. . .*

"Q. *You didn't know this was double stamped?* A. *No. That was a revelation to me to see that. . .* It was about a double stamp on this purse. I have never seen another

one double stamped. The only explanation that you could give for that would be that it had been an error in the manufacture, and he stamped it over before he sent it out. *If it had come to us showing definitely a double stamp, we would have returned the merchandise,* because a person buying that naturally would have detected that right away and it would have been practically unsalable with the two stamps. . ." (Italics inserted). "This stock and kind of merchandise all dropped out when the zipper came out a few years ago." At the time he sold the billfold to Mrs. McBride he had "very little of that kind".

This testimony of Sutton tends to disprove the contention that this is the same billfold Mrs. McBride purchased of him, rather than to identify it. It should be noted that Mr. Sutton states that he had never seen one before double stamped and that the one he sold Mrs. McBride had the "Masonic emblem" on it.

The billfold in question seems never to have been used by Mr. McBride, due apparently to the fact that it contained a double insigna, namely, the American Legion and the Shrine, and McBride was not a member of the Legion; so the billfold was put away in a drawer and no one appears to have paid any attention to it from that time until after the arrest in this case, and the sheriff made inquiry of McBride if he owned such a billfold. No one testifies positively to it being in the drawer or seeing it after it was placed there except Mrs. McBride, who testified as follows:

"You know it was in there about the first of February, and the next time you saw it was in the possession of the sheriff?

"A. Yes, sir. . .

"Q. From the time you bought it from Mr. Sutton ('several years ago') up until the 6th of June, it was your idea it was always in the home in that drawer? A. Oh, yes.

"Q. But you have no idea how it got out of there?

"A. No, I don't.

"Q. About all you know is that it is gone?

"A. And that is the only person that I know that was in my house."

The sheriff says the commitment and the sealed envelope containing the billfold were given to him May 26, 1942, (four days after the arrest) ; but it no where appears that he actually opened the sealed envelope or saw the billfold or examined it until the 5th of June, when it was delivered to him by the deputy, Donnelly, and opened.

There is conflict in the testimony of the police officer and the sheriff in the following particular: On the first trial, Mr. McClung, police officer, testified that the first time he saw the billfold in question was at the time of defendant's arrest, May 22, 1942; that he gave the billfold and other things (which were placed in a large envelope) to the sheriff, Mr. Moline, "on or about the 26th day of May, 1942, about four days after the date of arrest." The first time Mr. Moline saw the billfold was June 5th following. The record on the first trial shows that the sheriff received the billfold on March 26th. Questioned, on the second trial, as to whether this date was a mistake, Mr. Moline answered: "Absolutely. I won't say it is my mistake."

■ The fact, that defendant was a persistent violator of the law and had served terms for previous offenses, can not be accepted as evidence of his guilt on the present charge. However, it serves to illustrate the dangers and sometimes the price and penalty of having a bad record and an unsavory reputation. Nevertheless, the law not only allows but invites a criminal to reform, and his previous misdeeds must not be taken as evidence against him when on trial under charge of a subsequent offense. Suspicion will not support a verdict of conviction. (*State v. Henry*, 66 Ida. 60, 154 P. (2d) 184; *State v. Wilson*, 62 Ida. 282, 111 P. (2d) 868; *State v. Seymour*, 7 Ida. 257, 260, 61 P. 1033.)

■ Upon the whole, the evidence disclosed by the present record is less convincing and shrouded with more doubt of defendant's guilt than that disclosed on the former appeal. (*State v. Haynes*, supra.)

The view we take, as to the sufficiency of the evidence to support the verdict and judgment, renders it unneces-

sary for us to consider the assignment of error relating to the instruction given by the court to the jury on their reporting to the court their inability to agree.

The judgment is reversed and the cause is remanded with direction to dismiss the action.

Holden, J., and Glennon, D. J., concur.

Givens, J.—Since the majority opinion dismisses the action, it is unnecessary and would serve no good purpose to delineate the reasons dehors the majority opinion, which cause me to concur in a reversal and remand for a new trial, which I do, but not a dismissal.

Budge, J., dissents.